UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SIIBER MARKETING, INC., Plaintiff, v. MIXITFORME, INC. and CORY JOHNSON, Defendants. | CASE NO. 01:05 CV 2972 |
| | JUDGE DAN AARON POLSTER |
| | Magistrate Judge Vecchiarelli |
| MIXITFORME, INC., Counterclaim Plaintiff, v. SIIBER MARKETING, INC. and PETER ROESNER, 8152 Barberry Hill Dr. Mentor, Ohio 44060 Counterclaim Defendants. | |

## ANSWER AND COUNTERCLAIM

Defendants MixITforME, Inc. ("MFM") and Cory Johnson (the "Defendants"), by their attorneys, hereby answer the complaint of Siiber Marketing, Inc. ("Siiber") as follows:

1. Deny having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1.

2. Admit the allegations in paragraph 2.

3. Deny the allegations in paragraph 3, except admit that Cory Johnson is an individual and state that he resides at 272 Pierce Ave., Warwick, Rhode Island, 02888.

4. Deny the allegations in paragraph 4, except admit that sometime in or around August 2005 MFM agreed to ship a limited quantity of goods to Siiber's place of business, which Siiber represented would then be shipped to Siiber's customers, and further state that MFM made no commitment to fill all orders placed by Siiber.

5. Deny the allegations in paragraph 5, except admit that MFM shipped some goods to Siiber's place of business, and deny having knowledge or information sufficient to form a belief as to the truth of the allegations concerning Siiber's abilities to ship products to its own customers.

6. Deny the allegations in paragraph 6, except admit that MFM proposed to ship a limited quantity of goods to Siiber's customers in an attempt to expedite their delivery, state that MFM's proposal was conditioned upon Siiber's providing MFM with direct access to Siiber's database containing all order requests, and further state that MFM made no commitment to fill all orders placed by Siiber.

7. Deny the allegations in paragraph 7, except admit that Siiber sent certain order requests to MFM which contained packing lists and UPS shipping labels.

8. Admit the allegations in paragraph 8, but solely with respect to the orders that MFM agreed to fill and otherwise deny those allegations.

9. Deny the allegations in paragraph 9, and state that MFM informed Mr. Roesner that Siiber was placing orders in amounts substantially in excess of MFM's capacity to fill them, and that MFM refused to accept such orders.

10. Deny the allegations in paragraph 10, except admit that Siiber continued to send orders to MFM in excess of MFM's capacity to fill them, and from time to time purported to make payment on such orders.

11. Deny the allegations in paragraph 11, and further deny the existence of any agreement as alleged by Siiber.

12. Deny the allegations of paragraph 12, except deny having knowledge or information sufficient to form a belief as to the volume, if any, of accepted orders paid for by Siiber that were not shipped, and further state that MFM's current inability to determine that volume is a result of conduct by Siiber, including, without limitation, the following: (a) Siiber's flooding of MFM with vast numbers of orders exceeding MFM's stated capacity to fill; (b) Siiber's repeated redirection of purchased merchandise among Siiber's customers; and (c) Siiber's depriving of MFM access to an online database that was MFM's only means to track and account for ordered merchandise.

13. Deny the allegations in paragraph 13, state that, on or about September 27, 2005, American Express notified MFM that Siiber had placed multiple chargebacks on MFM's Merchant Account, and further state that, on information and belief, the amount of the chargebacks was $585,440.98, and state that such chargebacks were unjustified and ultimately led to the termination of MFM's Merchant Account with American Express.

14. Deny the allegations in paragraph 14, except admit that MFM and Johnson signed the document attached to the complaint as Exhibit A, state that the document speaks for itself as to its terms, and further state that the promissory note, signed at approximately 5 p.m. on October 7, 2005, was given under duress in that American Express had informed MFM that its Merchant Account status would be terminated imminently if it did not resolve the Siiber's

chargebacks, and that as consideration for the note, Siiber and its principal Peter Roesner ("Mr. Roesner") expressly agreed to remove the chargebacks on October 7, 2005, thereby to prevent such termination.

15. Admit the allegations in paragraph 15.

16. Deny having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16, except admit that, on October 11, 2005, MFM notified the bank to stop payment on a check, dated October 7, 2005, in the amount of $160,000, and states that, the reason for the stop payment was that MFM had learned that Siiber had failed to fulfill its promise to cancel its chargebacks on American Express, as a result of which American Express terminated MFM's Merchant Account, causing MFM substantial damage.

17. Deny the allegations in paragraph 17, and state that MFM informed Siiber that no money would be wired because Siiber had failed to timely remove all chargebacks on MFM's American Express Merchant Account resulting from Siiber's transactions.

18. Deny the allegations in paragraph 18, and specifically deny that any wire transfer was promised on October 17, 2005.

19. Deny the allegations in paragraph 19, except admit that on October 19, 2005, MFM executed a wire transfer of $160,000.00, posted on October 20, 2005, and state that this transfer was made, based on MFM's best estimate, to attempt to resolve its account with Siiber.

20. Deny the allegations in paragraph 20.

21. Deny having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21.

22. Admit the allegations in paragraph 22.

23. Deny having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23, and state that, on October 13, 2005, MFM notified the bank to stop payment on a check, dated October 21, 2005, in the amount of $134,728.51 dollars.

24. Deny having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24, and state that, on October 13, 2005, MFM notified the bank to stop payment on two checks, dated October 31 and November 8, 2005, both in the amount of $134,728.50.

"Count I – Breach of Contract"

25. In response to paragraph 25 of the Complaint, MFM incorporates as if set forth in full herein its responses to paragraphs 1 through and including 24 thereof.

26. Paragraph 26 asserts a legal conclusion which requires no response, but to the extent that a response is required, the allegations of paragraph 26 are denied.

27. Deny the allegations of paragraph 27, except deny having knowledge or information sufficient to form a belief as to the specific quantity of product shipped to Siiber, and further state that MFM's current inability to determine that volume is a result of conduct by Siiber, including, without limitation, the following: (a) Siiber's flooding of MFM with vast numbers of orders exceeding MFM's stated capacity to fill; (b) Siiber's repeated redirection of purchased merchandise among Siiber's customers; and (c) Siiber's depriving of MFM access to an online database that was MFM's only means to track and account for ordered merchandise.

28. Deny the allegations in paragraph 28.

29. Deny the allegations in paragraph 29.

30. Deny the allegations in paragraph 30, except admit that Siiber has demanded payment of certain sums by MFM.

"Count II – Breach of Contract on Promissory Note"

31. In response to paragraph 31 of the Complaint, MFM incorporates as if set forth in full herein its responses to paragraphs 1 through and including 30 thereof.

32. Paragraph 32 asserts a legal conclusion which requires no response, but to the extent that a response is required, the allegations of paragraph 32 are denied.

33. Deny the allegations in paragraph 33.

34. Deny the allegations in paragraph 34.

35. Deny the allegations in paragraph 35.

"Count III – Fraud of Contract in Business Arrangement"

36. In response to paragraph 36 of the Complaint, MFM incorporates as if set forth in full herein its responses to paragraphs 1 through and including 35 thereof.

37. Deny the allegations in paragraph 37.

38. Deny the allegations in paragraph 38.

39. Deny the allegations in paragraph 39.

40. Deny the allegations in paragraph 40.

"Count IV – Fraud of Contract in Promissory Note"

41. In response to paragraph 41 of the Complaint, MFM incorporates as if set forth in full herein its responses to paragraphs 1 through and including 40 thereof.

42. Deny the allegations in paragraph 42.

43. Deny the allegations in paragraph 43.

44. Deny the allegations in paragraph 44.

45. Deny the allegations in paragraph 44.

"Count V – Conversion"

46. In response to paragraph 46 of the Complaint, MFM incorporates as if set forth in full herein its responses to paragraphs 1 through and including 45 thereof.

47. Deny the allegations in paragraph 47.

48. Deny the allegations in paragraph 48.

49. Deny the allegations in paragraph 49.

50. Deny the allegations in paragraph 50.

"Count VI – Ohio Rev. Code § 2307.61"

51. In response to paragraph 51 of the Complaint, MFM incorporates as if set forth in full herein its responses to paragraphs 1 through and including 50 thereof.

52. Deny allegations in paragraph 52.

53. Deny allegations in paragraph 53.

54. Deny allegations in paragraph 54.

55. Deny allegations in paragraph 55.

First Affirmative Defense

No enforceable contract as alleged in Count I existed between MFM and Siiber.

Second Affirmative Defense

Any damages or losses suffered by Siiber in its dealings with MFM were a result of Siiber's conduct for which MFM is not responsible.

Third Affirmative Defense

The contract relied upon by Siiber is unenforceable due to the applicable statute of frauds.

Fourth Affirmative Defense

There was a condition precedent to the promissory note mentioned in the complaint, namely, the timely release of all chargebacks on MFM's Merchant Account with American Express, but Siiber did not timely perform said condition precedent.

Fifth Affirmative Defense

Siiber fraudulently induced MFM to sign a promissory note by stating that it would immediately release all chargebacks on MFM's merchant account with American Express if MFM executed a promissory note, when in fact Siiber knew that it never intended, nor had the authority, to effect an immediate release of all the chargebacks.

Sixth Affirmative Defense

The promissory note referred to in the complaint was obtained from MFM by Siiber by duress in that Siiber unlawfully threatened to have MFM's Merchant Account frozen and ultimately canceled if MFM did not execute a promissory note within a limited timeframe, and MFM, solely in consequence of said threats, and fear that Siiber would execute the same, made and delivered the promissory note, and not otherwise.

Seventh Affirmative Defense

The promissory note referred to in Siiber's complaint was made, executed, signed and delivered without consideration on Siiber's part.

Eighth Affirmative Defense

Count II of the complaint fails to state a claim upon which Siiber may recover in that Siiber is not a party to the promissory note.

Ninth Affirmative Defense

MFM and Corey Johnson possessed no intent to defraud because Siiber knew prior to depositing post-dated checks that the checks would not be paid due to Siiber's failure to timely release all claimed chargebacks on MFM's Merchant Account associated with Siiber.

Tenth Affirmative Defense

Ohio Rev. Code Ann. § 2307.61 is inapplicable where the alleged bad checks originate from a promissory note governed by Rhode Island law.

Eleventh Affirmative Defense

Payment of pre-existing debt by an alleged bad check does not independently constitute passing of a bad check under Ohio Rev. Code Ann. § 2913.11 because the creditor is not fraudulently induced to part with property in reliance upon the value of the check and the debt still remains.

**WHEREFORE**, MFM respectfully demand that Complaint be dismissed with prejudice; that the Court award MFM its costs and expenses of this action, including reasonable attorneys' fees; and that the Court grant MFM such further relief as is just.

**COUNTERCLAIM**

As and for its counterclaim against Siiber and Mr. Roesner, MFM alleges the following:

1. MFM is a business that sells electronic merchandise to consumers and business resellers at below market prices. MFM began operations in June 2005.

2. MFM processed the majority of orders placed by business resellers through its American Express Merchant Account ("Merchant Account").

3. Whenever MFM transacted business under its Merchant Account, American Express withheld payment disbursements to MFM until orders placed by business resellers reached their shipment destination. In addition, when a business reseller contested a delivery shipment, American Express withheld payment disbursements subject to resolution of the business reseller's concerns (hereinafter the "chargeback policy").

4. American Express also has a policy of suspending or terminating a Merchant Account whenever the quantity and monetary amount of chargebacks reaches a level that American Express believes to be unacceptable. After a corporation's merchant account is terminated or suspended, that corporation cannot transact business with many companies because of its inability to use American Express to process a transaction.

5. Upon information and belief, Pete Roesner owns and operates Siiber, a company that purchases electronic merchandise in bulk for businesses to be used as marketing gifts.

6. Upon information and belief, Mr. Roesner also owns and operates WholesalersClub.com, Inc., which sells, among other things, electronic merchandise to individual consumers.

7. Beginning in or around June 2005, Mr. Roesner from time to time ordered products from MFM through MFM's website, totaling $196,739. Mr. Roesner used an American Express card to make these purchases.

8. Prior to August 17, 2005, all transactions between MFM and Mr. Roesner occurred through MFM's website, and MFM delivered all ordered products to Mr. Roesner.

9. Sometime in early August 2005, Mr. Roesner contacted MFM and sought to be considered for MFM's reseller program, which would permit Mr. Roesner to purchase a greater quantity of merchandise at a lower price.

10. Mr. Roesner expressed to MFM his desire to purchase merchandise for Siiber. Mr. Roesner also indicated that he intended to use some of the merchandise to satisfy orders originating from the WholesalersClub.com website.

11. Based on Mr. Roesner's stated needs, MFM agreed to ship fifty (50) orders per day directly to Siiber's place of business.

12. In addition, Mr. Roesner insisted on providing MFM with UPS shipping labels and packing slips for each order. This practice is disfavored by most shipping companies because the return address on the shipping label differs from the actual shipping address. Because MFM was a start-up corporation, it did not know this practice was discouraged.

13. Mr. Roesner also insisted that MFM could not keep any records detailing information concerning Siiber's customers or their purchases.

14. From the outset, Mr. Roesner and Siiber failed to abide by the agreement. Despite the expressed terms regarding the volume of merchandise available to Siiber, Mr. Roesner would, on a daily basis, over commit to Siiber customers, and subsequently demand that MFM timely meet order requests that grossly exceeded what MFM originally agreed to fill.

15. In addition, after placing orders, Mr. Roesner continually sought to change the agreed upon pricing.

16. Moreover, Mr. Roesner would pay for the orders via bulk payments instead of matching charges with individual orders. Mr. Roesner made payments by cash, check, and two different American Express cards.

17. As a direct result of Mr. Roesner's failure to abide by the agreement, MFM fell behind in timely shipping orders above and beyond the originally agreed upon amount. Accordingly, MFM told Mr. Roesner and Siiber that it could not handle most of the excessive orders, and returned over one thousand (1,000) UPS shipping labels to Mr. Roesner.

18. Despite the untimely shipping, Mr. Roesner continued to flood MFM with orders, but requested that MFM ship products directly to Siiber's customers. Mr. Roesner also requested that some orders be shipped via overnight air.

19. MFM consented to modify the original agreement in terms of product destination and delivery method, but conditioned the modification on MFM receiving access to the database containing the order requests ("order database"). MFM, however, refused to increase the amount of orders it would ship.

20. Mr. Roesner agreed to the new terms, and gave MFM access to the order database. The database revealed that thousands of orders from Mr. Roesner originated from customers of WholesalersClub.com, not Siiber.

21. MFM offered to assist Siiber by providing a special customer service representative and phone line to handle customer complaints. Mr. Roesner and Siiber agreed to pay MFM for operating this service. To date, neither Mr. Roesner nor Siiber has paid for these services.

22. Although MFM informed Mr. Roesner that the service would take a prescribed time to set up, Mr. Roesner and Siiber immediately began redirecting all complaints to MFM.

23. In addition, MFM's new shipping arrangement with Mr. Roesner and Siiber Marketing resulted in substantial additional shipping fees. To date, neither Mr. Roesner nor Siiber has fulfilled his or its obligation to recompense MFM for these expenses.

24. Moreover, notwithstanding MFM's insistence that orders be limited to fifty per day, Mr. Roesner and Siiber continued to bury MFM with hundreds of orders per day. In addition, Mr. Roesner would fax handwritten notes or send emails redirecting product purchased by individual consumers from the WholesalersClub.com to Siiber's customers.

25. Mr. Roesner threatened MFM that any failure to accede to his demands to fulfill additional order requests would result in Mr. Roesner contacting American Express and requesting chargebacks on all ordered merchandise. At the time of these threats, MFM's Merchant Account had a significant amount of charges from Siiber that had yet to be disbursed to MFM, but where the ordered merchandise had already been shipped to Siiber.

26. Mr. Roesner's insistence that MFM use Siiber's shipping labels frustrated attempts by MFM to accurately account for products shipped. Furthermore, Mr. Roesner's shifting of orders exacerbated the difficulty in tracking products. Although MFM sought help from UPS regarding shipments sent by MFM to Siiber's customers, UPS stated that only Siiber as the account holder could request such information.

27. In or around late September 2005, MFM realized that Siiber's inundation of orders, the constant redirecting of purchased merchandise, Mr. Roesner's insistence that MFM use Siiber's prepaid UPS shipping label, his refusal to pay additional shipping charges of overnight air shipments and his refusal to allow MFM to maintain its own records regarding

individual customer information drained MFM's resources, forcing MFM to seek to end its relationship with Mr. Roesner and Siiber.

28. MFM began the process of accounting for items shipped versus items purchased by Siiber. Because Mr. Roesner limited MFM's ability to retain its own records, MFM sought to use the order database to make the accounting. In addition, MFM hired an accountant to assist with resolving the account.

29. Once Mr. Roesner learned that MFM was using the order database to assess the costs incurred to MFM as a result its dealings with Siiber, Mr. Roesner denied access to the order database.

30. In addition, unbeknownst to MFM, Mr. Roesner contacted American Express and sought $585,440.98 in chargebacks. Mr. Roesner's chargeback requests included stop payments for merchandise previously received by Siiber, including but not limited to, merchandise ordered through MFM's website.

31. The volume and amount of Mr. Roesner's chargeback requests prompted American Express to immediately place a reserve requirement on MFM's Merchant Account. Under this reserve requirement, American Express withheld all money entering MFM's merchant account, including all other transactions with business resellers, until the volume and amount of the chargeback requests were significantly decreased.

32. MFM contacted American Express, who informed MFM of Mr. Roesner's multiple chargeback requests, the reserve requirement, and the fact that neither Mr. Roesner nor Siiber Marketing had authorization to make purchases on one of the credit cards that Mr. Roesner is requesting a chargeback because it belonged to a third party.

33. American Express also informed MFM that Mr. Roesner has a history of problems with his American Express account, making suspect any company that conducts transactions with Mr. Roesner. Mr. Roesner never told MFM of these prior infractions.

34. In addition, upon information and belief, Mr. Roesner requested a chargeback on all merchandise because a payment to American Express had come due, but Mr. Roesner had no funds to make a payment. Upon information and belief, by contesting a charge on his account, Mr. Roesner did not have to make payments on his American Express account until the dispute was resolved.

35. MFM contacted Mr. Roesner regarding the chargebacks. Mr. Roesner admitted that Siiber in fact received items purchased through his American Express account, but that he believed his only recourse to collect funds originally sent by check or cash was to allege that all shipments made under his American Express account had not been shipped.

36. Mr. Roesner threatened to retain his chargeback requests until he and Siiber received money in the amount he believed to be satisfactory.

37. Knowing that he controlled the future of MFM's American Express Merchant Account, Mr. Roesner demanded that MFM, and its owner (Cory Johnson) in his personal capacity, sign a promissory note, made out to "Pete Roesner of Siiber Marketing," in the amount of $564,185.51 by October 7, 2005. Mr. Roesner promised that he would immediately contact American Express and have the chargebacks removed should MFM agree to execute the promissory note.

38. At or around 4:30 p.m., on October 7, 2005, Mr. Roesner demanded that the promissory note be signed and sent to Mr. Roesner by 6:00 p.m. that same day, or he would

continue to allege that no products were shipped by MFM, essentially leading to the termination of MFM's Merchant Account.

39. Threatened by the loss of its primary business tool, namely its Merchant Account, and relying upon Mr. Roesner's statements that he would remove the chargeback requests, MFM and Cory Johnson signed a promissory note, attached to the complaint as Exhibit A, conditioned upon the immediate removal of the chargeback requests.

40. Mr. Roesner demanded that the signed promissory note, and four post-dated checks, be delivered not to Siiber, but his personal home address. On October 7, 2005, MFM sent the documents to Mr. Roesner via overnight mail.

41. In addition, at our around 5:19 p.m., on October 7, 2005, Mr. Roesner re-affirmed his promise that he would remove all disputes on MFM's Merchant Account.

42. On or around October 10, 12005, Mr. Roesner contacted MFM and stated that he had removed all the chargeback requests.

43. However, on October 11, 2005, American Express informed MFM that Mr. Roesner and Siiber were still disputing $312,031.00, and that American Express would continue to hold these funds.

44. On our about October 11, 2005, MFM contacted Mr. Roesner and Siiber Marketing and reminded them that all payments of the promissory note were conditioned upon the removal of the chargebacks.

45. MFM stopped payment on the checks accompanying the promissory note because Mr. Roesner and Siiber Marketing did not timely reverse all chargebacks on the American Express Merchant Account.

46. On October 14, 2005, Mr. Roesner informed MFM that American Express would not work with him to reverse the chargeback he requested because he was not the authorized user of the credit card in question.

47. In the subsequent weeks, MFM worked with American Express and eventually removed the chargebacks from its Merchant Account. However, on or about November 8, 2005, and as a direct result of Mr. Roesner's initiation and subsequent failure to timely correct the chargebacks in question, American Express terminated MFM's Merchant Account.

48. A significant number of business resellers now refuse to work with MFM because they cannot use American Express to purchase products, resulting in a significant loss of business to MFM. The amount of loss business averages between $5,000,000-$10,000,000 (5 to 10 Million dollars) a month.

49. In addition, on November 15 and November 17, 2005, Mr. Roesner contacted American Express and re-alleged most of the previously removed chargebacks, totaling $417,681.51. Mr. Roesner's conduct further damaged MFM's attempts to restore its Merchant Account with American Express.

**COUNT I**

(Demand for Accounting)

50. MFM repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

51. MFM has frequently and from time to time made shipments of merchandise to Siiber or Siiber's customers.

52. All shipped merchandise was received by Siiber or its customers.

53. The exact amount of merchandise shipped is unknown to MFM and MFM cannot state such amount in this counterclaim as a result of conduct by Siiber, including, without limitation, the following: (a) Siiber's flooding of MFM with vast numbers of orders exceeding MFM's stated capacity to fill; (b) Siiber's repeated redirection of purchased merchandise among Siiber's customers; (c) Siiber's insistence on providing MFM with UPS shipping labels and packing slips for each order; and (d) Siiber's insistence that MFM not keep any records detailing information concerning Siiber's customers or their purchases.

54. Moreover, the exact volume of merchandise shipped to Siiber is uniquely within Siiber's knowledge because Siiber deprived MFM access to an online database that was MFM's only means to track and account for ordered merchandise.

55. The accurate status of the account between MFM on one hand and Siiber and Mr. Roesner on the other would be shown by an accounting.

56. MFM is entitled to an accounting as to its transactions with Mr. Roesner, Siiber and related parties as a result of the misconduct described herein.

**COUNT II**

(Interference with Advantageous Business Relations)

57. MFM repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

58. MFM maintained a business relationship with American Express, whereby most of MFM's business to business transactions were directed through MFM's Merchant Account with American Express.

59. Mr. Roesner and Siiber knew of the contractual relationship between American Express and MFM.

60. Mr. Roesner and Siiber intentionally and maliciously interfered with the relationship between MFM and Siiber by falsely claiming chargebacks on MFM's Merchant Account.

61. As a direct result of Mr. Roesner's and Siiber's false chargebacks and subsequent refusal to reverse all chargebacks, American Express terminated its contractual relationship with MFM, causing lost profits, due to missed sales of millions of dollars worth or merchandise, and a loss of goodwill.

## COUNT III

(Deceit)

62. MFM repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

63. Mr. Roesner stated that Siiber had a viable American Express charge account that could legally be used by Siiber to make merchandise purchases.

64. Upon information and belief, Mr. Roesner and Siiber intended this misrepresentation to deceive MFM and induce MFM to accept an American Express charge account to which Siiber had no legal right to utilize.

65. MFM reasonably relied on Mr. Roesner's false statements, and allowed Siiber to charge purchases on the American Express Account provided by Mr. Roesner.

66. As a result, MFM suffered monetary damages, loss of its Merchant Account and loss of business.

**COUNT IV**

(Injurious Falsehood)

67. MFM repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

68. Mr. Roesner and Siiber used an American Express charge account to make merchandise purchases from MFM.

69. Although Mr. Roesner knew and admitted that MFM shipped the goods purchased on the American Express charge account, Mr. Roesner contacted American Express and requested several chargebacks by making false statements that Siiber had not received any shipments sent by MFM.

70. Mr. Roesner intended his false statements to result in harm to MFM's relationship with American Express, and/or recognized or should have recognized that his statements were likely to cause injury.

71. Mr. Roesner knew that his statements claiming that he received no shipments from MFM that were paid by his American Express Account were false, or acted with the truth in a reckless manner.

72. The foregoing conduct by Mr. Roesner was undertaken both on his behalf personally and on behalf of Siiber.

73. As a result, American Express relied on Mr. Roesner's false statements, leading to the termination of MFM's Merchant Account, causing MFM lost profits, due to missed sales of millions of dollars worth or merchandise, and a loss of goodwill.

**REQUEST FOR RELIEF**

WHEREFORE, MFM requests that the court:

74. Compel Mr. Roesner and Siiber to account for all transactions, payments and shipments in connection with this suit.

75. Enter judgment in its favor against Mr. Roesner and Siiber Marketing for all damages sustained as a result of Mr. Roesner's and Siiber Marketing's conduct, together with interest and costs.

76. Grant MFM such other and further relief as the court deems just.

**JURY DEMAND**

MFM respectfully requests a trial by Jury on all issues so triable.

Respectfully submitted,

s/Ira K. Gross

Ira K. Gross
William J. Rocha
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts 02109
Phone: (617) 338-2800
Fax: (617) 338-2880
igross@sandw.com
wrocha@sandw.com

Jayne L. Jakubaitis (0059485)
BRICKER & ECKLER LLP
1375 E. 9th Street, Suite 1500
Cleveland, Ohio 44114
(216) 523-5405
jjakubatis@bricker.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2006, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

s/Ira K. Gross
Ira K. Gross
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts 02109
(617) 338-2800
Phone: (617) 338-2800
Fax: (617) 338-2880
igross@sandw.com